IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ALEXANDER CARLISLE, | ) | CASE NO. 1:25-CV-01267-BYP |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | JUDGE BENITA Y. PEARSON |
| | ) | UNITED STATES DISTRICT JUDGE |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY | ) | MAGISTRATE JUDGE |
| ADMINISTRATION, | ) | JONATHAN D. GREENBERG |
| | ) | |
| Defendant. | ) | **REPORT & RECOMMENDATION** |
| | ) | |
| | ) | |

Plaintiff, Alexander Carlisle ("Plaintiff" or "Carlisle"), challenges the final decision of Defendant, Frank J. Bisignano,[1] Commissioner of Social Security ("Commissioner"), denying his applications for Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be VACATED AND REMANDED for further proceedings consistent with this opinion.

---

[1] On May 7, 2025, Frank J. Bisignano became the Commissioner of Social Security.

1

## I. PROCEDURAL HISTORY

In March 2021[2], Carlisle filed an application for DIB and SSI, alleging a disability onset date of January 1, 2010, and claiming he was disabled due to bipolar disorder, depression, panic disorder, social phobia, social anxiety disorder, and "lower back".  (Transcript ("Tr.") 114, 126.)  The applications were denied initially and upon reconsideration, and Carlisle requested a hearing before an administrative law judge ("ALJ").  (*Id*. at 106, 169, 174, 179, 184, 191, 196, 201, 204, 207.)

On May 1, 2023, an ALJ held a hearing, during which Carlisle, represented by counsel, testified. (*Id*. at 60-81.) The ALJ requested that Carlisle present for a psychological consultative examination and concluded the hearing. (*Id*. at 79) On October 16, 2023, the ALJ held another hearing, during which Carlisle, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id*. at 44-59.)  On January 5, 2024, the ALJ issued a written decision finding Carlisle was not disabled.  (*Id*. at 22-35.)  The ALJ's decision became final on April 23, 2025, when the Appeals Council declined further review.  (*Id*. at 6.)

On June 17, 2025, Carlisle filed his Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 7, 9.) Carlisle asserts the following assignments of error:

1. WHETHER THE ALJ'S FINDING AT STEP TWO OF THE SEQUENTIAL EVALUATION IS SUPPORTED BY SUBSTANTIAL EVIDENCE.

2. WHEHER [SIC] THE ADMINISTRATIVE LAW JUDGE ERRED IN HER EVALUATION OF PLAINTIFF'S CREDIBILITY.

3. WHETHER THE ADMINISTRATIVE LAW JUDGE'S ('ALJ') ERRED IN HIS [SIC] EVALUATION OF THE OPINION EVIDENCE.

(Doc. No. 7.)

---

[2] Carlisle was found disabled in 2012 and, following a continuing disability review, benefits ceased in 2016. (*See* Transcript 117.) In 2016, Carlisle filed another application, which was denied in 2017. (*Id*. at 114.) In 2018, Carlisle again filed for benefits, which was denied by an ALJ in 2020. (*Id*. at 82, 106.)

## II. EVIDENCE

### A.     Personal and Vocational Evidence

Carlisle was born in 1971 and was 52 years-old at the time of his administrative hearing (Tr. 112.), making him a "person closely approaching advanced age" under Social Security regulations.  *See* 20 C.F.R. §§ 404.1563(d), 416.963(d).  He has a high school education.  (Tr. 139.)  He has no past relevant work.  (*Id.* at 45.)

### B.     Relevant Medical Evidence[3]

On May 11, 2021, Carlisle was visited at his home by Jason Kravetz of Crossroads Health. (*Id*. at 1060.) He assisted Carlisle with completing Social Security paperwork for his Social Security attorney. (*Id*. at 1062.) Kravetz reviewed coping skills with Plaintiff, including working on old cars, enjoying warmer weather, and spending time with his girlfriend and father. (*Id*.) Carlisle was receptive, responsive, and engaged in case-management services. (*Id*.) He was "stable, coherent, and pleasant." (*Id*.)

On May 19, 2021, Carlisle saw Dr. Schenkelberg for a medication management virtual appointment. (*Id*. at 1041.) The conditions being treated were "bipolar, panic, cannabis." (*Id*. at 1044.) He reported his mood is "alright" and he had experienced a couple of panic attacks due to the stress of caring for his father. (*Id*.) He lives with his father who has dementia and Parkinson's disease. (*Id*.) Mental status exam revealed he was alert and oriented, intact attention and concentration, friendly and cooperative behavior, "alright" mood, blunted affect, logical and linear thought process, no evidence of delusions or hallucinations, appropriate fund of knowledge, good judgment and insight, and memory unchanged from previous visits. (*Id*. at 1045.)

---

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

On June 16, 2021, Kravetz accompanied Plaintiff to the Ashtabula County Court and assisted him in understanding what is going on in court and in verbally communicating with the judge and clerk. (*Id*. at 1069-70.) Kravetz took him home after court. (*Id*. at 1070.)

On June 17, 2021, Plaintiff presented to Dr. Schenkelberg for an in-person medication management appointment. (*Id*. at 1050.) Plaintiff reported his mood is "alright", denies suicidal thoughts, reported a couple panic attacks and improved sleep. (*Id*. at 1053.) He reported still living with his father and "hoping to get him a case manager and ultimately a nursing aid a couple times a week." (*Id*.) He stated he is trying to get back on SSI. (*Id*.) Mental status exam was the same as the prior visit, relatively normal, absent "alright" mood and blunted affect. (*Id*. at 1055.)

On August 5, 2021, Kravetz visited Carlisle at his home. (*Id*. at 1166.) He helped Plaintiff complete Social Security paperwork. (*Id*. at 1168.) Kravetz reported he was "receptive, responsive, and willing to engage in case management-related services." (*Id*.) He was stable and reported taking his medications as prescribed. (*Id*.)

On October 14, 2021, Carlisle attended a virtual appointment with Dr. Schenkelberg. (*Id*. at 1139.) He reported his mood was the same, sleep is improved, he had a couple of panic attacks "but it seems like everything is calming down now", and reported breaking up with his girlfriend which he stated was a good thing. (*Id*. at 1042.) Mental status exam was normal, aside from monotone speech, "alright" mood, and blunted affect. (*Id*. at 1143.)

On October 19, 2021, Kravetz visited Carlisle at his home. (*Id*. at 1170.) Kravetz helped him go through his mail. (*Id*. at 1172.) Kravetz reported Carlisle was stable, completed his anger management group goal and his probation goal. (*Id*. at 1173.) Kravetz worked to contact Social Security to reschedule an appointment Carlisle missed. (*Id*.)

On December 22, 2021, Kravetz visited Carlisle at his home. (*Id*. at 1177.) Kravetz assisted him with contacting Social Security to receive a new date for an assessment because he missed the appointment. (*Id*. at 1178-79.)

On January 26, 2022, Carlisle attended a virtual appointment with Dr. Schenkelberg. (*Id*. at 1148.) He reported "alright" mood, sleeping "alright", a couple of panic attacks since the last visit, and using cannabis for his anxiety. (*Id*. at 1151.) Mental status exam was normal aside from monotone speech, "alright" mood, and blunted affect. (*Id*. at 1152.)

On May 24, 2022, Carlisle attended a virtual appointment with Dr. Schenkelberg. (*Id*. at 1157.) He reported his mood "not too bad", sleeping well, experience a couple of panic attacks but reporting, "I think I got a handle on it." (*Id*. at 1160.) Mental status exam was normal aside from blunted affected and monotone speech. (*Id*. at 1161.)

On June 20, 2022, Kravetz visited Carlisle at his home. (*Id*. at 1189.) Carlisle reported continuing to live with and take care of his father. (*Id*. at 1191.) He reported his father fell hard and he had to call 911. (*Id*.) He reported feeling surprised and happy when his siblings told him he can have his father's house when he passes away due to all the time he's spent over the years caring for his father's needs. (*Id*.) He reported daily depression and anxiety, and enjoying working on his motorcycle and spending time fixing things. (*Id*.)

On September 14, 2022, Carlisle presented for a follow-up appointment with Dr. Schenkelberg. (*Id*. at 1193.) Carlisle reported feeling the same, sleeping "alright", having a few panic attacks over the last several months, including one at his ex-wife's funeral. (*Id*.) Mental status exam included: "Patient presents as cooperative, alert, fully oriented. Speech regular rate and rhythm. Language skills are intact. Mood "good". Affect is congruent, reactive, full. Thoughts linear. Associations intact. No delusions evident. No AH/VH. Denies SI/HI. Fund of knowledge normal. Attention intact. Short-term and long-term memory intact. Insight good. Judgment good." (*Id*. at 1194.)

On December 1, 2022, Dr. Schenkelberg completed Mental Residual Functional Capacity Questionnaire. (*Id*. at 1197.) He reported treating Plaintiff since February 2019. (*Id*.) He described clinical findings including poor hygiene, low motivation, poor insight, poor judgment, easily agitated, severe panic attacks in social situations, intermittent thoughts of suicide, and poor concentration. (*Id*.) When evaluating Plaintiff's mental abilities to do work, Dr. Schenkelberg indicated he had "no useful ability to function" or was "unable to meet competitive standards". (*Id*. at 1199-1200.) Dr. Schenkelberg explained that his anxiety, panic attacks, impair cognition, and inability to follow social norms renders him unable to function in the indicated areas. (*Id*. at 1200.) Dr. Schenkelberg explained Plaintiff has history of low IQ since childhood. (*Id*.)

On January 19, 2023, Kravetz visited Carlisle at his home, and attended a phone call with Carlisle's Social Security attorney to help Carlisle answer questions in preparation for a hearing. (*Id*. at 1204-5.)

On January 25, 2023, Kravetz visited Carlisle at his home to assist him with his Social Security hearing. (*Id*. at 1206-7.) The hearing was postponed due to an issue with the vocational expert. (*Id*. at 1207.) Kravetz accompanied Carlisle to Walmart to obtain new glasses. (*Id*.)

On March 7, 2023, Kravetz visited Carlisle at his home. (*Id*. at 1208.) Kravetz helped explain mail he received from Social Security. (*Id*. at 1209.)

On March 9, 2023, Carlisle presented for a follow-up appointment with Dr. Schenkelberg. (*Id*. at 1210.) Carlisle reported feeling "alright", sleeping alright, increased anxiety attributed to his father, and consuming cannabis daily. (*Id*.) Mental status exam was normal aside from blunted affect. (*Id*. at 1211.)

On July 5, 2023, Carlisle underwent a psychological evaluation by Dr. Konieczny. (*Id*. at 1219.) Dr. Konieczny reported Carlisle presented with adequate hygiene, was cooperative, appeared somewhat blunted, was slow in his responses but responded to all questions, and reported getting frustrated which leads to his temper. (*Id*. at 1220.) Dr. Konieczny reported that he showed a slight degree of poverty of

6

content in his speech, but his speech was greater than anticipated given the results of intellectual testing. (*Id*.) He expressed himself in a clear and coherent manner. (*Id*.) He had very poor eye contact, reported difficulties sleeping, and reported feeling drowsy from medication. (*Id*. at 1221.) He showed impairment in concentration, did not respond correctly to serial three-subtraction, recalled two of three objects after a period of five minutes, and he did not show a deficit in his ability to perform abstract reasoning. (*Id*.) He showed deficits in his awareness of social judgment and conformity, and overall judgment. (*Id*.) His IQ testing results places him in the "extremely low range of adult intellectual functioning." (*Id*. at 1222.) Results of memory testing place Carlisle in the extremely low range. (*Id*.) Dr. Konieczny opined that his recent intellectual decline and memory difficulties could be due to his history of drug and alcohol use. (*Id*.) Dr. Konieczny thought Carlisle would have a significant limitation in his ability to understand, remember, and carry out instructions; would have difficulty maintaining focus and persistence on multi-step tasks; would have a significantly diminished tolerance for frustration and diminished coping skills that would impact his ability to respond to supervision and respond to workplace pressure. (*Id*. at 1223.)

**C.     State Agency Reports**

**1.          Mental Impairments**

On October 6, 2021, Janet Souder, PsyD., reviewed the claim file and opined Carlisle had moderate limitations in understanding, remembering, or applying information, interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing himself. (*Id*. at 120.) Dr. Souder noted her opinion is an adoption of the May 15, 2020 ALJ decision because "current evidence does not show significant changes from the ALJ [decision] and the ALJ [findings are] thus adopted." (*Id*.)

On July 26, 2022, on reconsideration, Kristen Haskins, PsyD., affirmed Dr. Souder's findings. (*Id*. at 149-151.)

**D.        Hearing Testimony**

During the May 1, 2023 hearing, Carlisle testified to the following:

• He has a case manager, Jason Kravetz, that helps him a lot and takes him to court to resolve issues including child support and domestic violence. (*Id*. at 66-67.) He spent time in jail and on probation due to domestic violence charges. (*Id*. at 67.) He has been off probation for over a year and has "had no more trouble." (*Id*. at 67-68.) He has been working with Mr. Kravetz for a few years. (*Id*. at 70.) Mr. Kravetz visits him at his home and takes him places like doctor appointments or court hearings. (*Id*.) Mr. Kravetz helps go through his mail and manage documents and correspondence. (*Id*. at 72.)

• His moods go from one extreme to another. (*Id*. at 68.) He cannot be around people. (*Id*.) He stays in his room. (*Id*.) He has no patience. (*Id*.) He does not like talking on the phone. (*Id*.) He experiences panic attacks two to three times per week where he cannot breathe or talk. (*Id*.) His mood fluctuates every day. (Id. at 69.) Panic attacks last 15-20 minutes. (*Id*.) He takes medication for anxiety and panic attacks. (*Id*.) He feels anxious and paranoid around people out in public. (*Id*. at 70.)

• He lives with his father who is chronically ill. (*Id*. at 71.) He does not do anything to care for his father; nurses come in and do that. (*Id*.) Nurses visit a couple of times per week. (*Id*.) He does not prepare meals for him or manage his medication. (*Id*.) His sister lives in the area and takes care of those things. (*Id*.) His sister helps care for both him and his father. (*Id*.) He has a neighbor that will grocery shop for him. (*Id*. at 72.) He does not drive because he cannot focus and gets road rage. (*Id*.) He no longer has a cell phone because he smashed it. (*Id*.)

The ALJ questioned whether there was objective documentation of Plaintiff's mental health issues. (*Id*. at 72-79.) The ALJ pointed out Plaintiff received several notices to appear for a consultative examination and did not appear. (*Id*. at 75.) Attorney for Plaintiff explained that, despite missing appointments, Plaintiff appeared once for a consultative examination, but no one was present to perform the evaluation. (*Id*.) The ALJ expressed concern that there is no objective documentation to explain Carlisle's "distinct difference between the way he was and the way he is now . . ." indicating a decline from prior applications. (*Id*. at 73.) The ALJ explained that she would like to see an objective test that evaluates the reliability and consistency of Plaintiff's remarks, statements, and reasons. (*Id*. at 79.) The hearing concluded.

On October 16, 2023, the ALJ held another hearing. (*Id*. at 42-59.) Carlisle testified to the following:

8

• He explained Mr. Kravetz helps him with day-to-day activities like going to the store for him, taking him to get glasses, helping with mail he receives, helping with documents received from Social Security regarding this matter, and helping to ensure he understands the material. (*Id*. at 51.) Mr. Kravetz helped him navigate issues with probation and some legal issues. (*Id*. at 53.)

• He panics around people. (*Id*. at 52.) When he is out in public he feels uncomfortable and like he can't breathe. (*Id*.) He takes medication for panic attacks. (*Id*.) He has not had a panic attack in about three weeks. (*Id*.) He describes his mood as depressed on a daily basis. (*Id*.) In terms of mood fluctuation, "some days are better than others." (*Id*. at 52-53.)

• He has had no issues with substance abuse or related to law enforcement since the instant application was filed. (*Id*. at 53.) He was on probation for court-ordered anger management due to domestic violence against an ex-girlfriend. (*Id*. at 54.)

The ALJ posed the following hypothetical question to the VE:

> Assume an individual who can lift and carry up to 25 pounds frequently and up to 50 pounds occasionally, never climb ladders, ropes, or scaffolds, frequently climb ramps and stairs, avoid all exposure to hazardous equipment, and work at unprotected heights. As for mental, can understand – can perform -- let's put it this way: can perform simple, routine tasks with infrequent change, and no fast-pace or high-production quotas. In other words, no hourly quotas. Should have no direct work with the general public, but I'll say incidental contact is fine. So the -- my example that I like to use is, your job as a dishwasher requires no contact or providing of services to the patrons of the restaurant. However, if the manager says, please go out and get the dirty dishes from the cart and in doing so, the dishwasher has -- comes face-to-face with a customer, that would be what I consider acceptable incidental contact, okay? Whereas a greeter, or a cashier, those services are providing service directly -- I mean, those jobs provide services directly to the general public and that would not be acceptable, okay? And so, can interact with coworkers for a short duration and for a specific purpose, such as asking questions, clarifying instructions, gathering information, helping or using hand gestures, you know, to point or direct where items may be placed. Can work in a setting that does not require exposure to crowds. In other words, ten or less people in this setting. And can perform what is defined as low stress work, meaning no arbitration, negotiation, responsibility of the safety of others, or supervisory responsibility. So as you review this hypothetical individual, can you tell if you can identify any work for such a person?

(*Id*. at 55-56.)

The VE testified the hypothetical individual would be able to perform representative jobs in the economy, such as cleaner II, stores laborer, and packer. (*Id*. at 56.) Plaintiff's attorney asked, "do you have an opinion concerning the threshold tolerated for off task behavior in unskilled work activity?" (*Id*.) The VE responded, "I have found that the tolerance for being off task is 15% or below. So if an individual is off task 16% or greater in a work day, that would preclude work." (*Id*. at 56-57.) The VE explained the tolerance for absenteeism is about 6 unexcused absences in a 12-month period, including coming to work late and leaving early. (*Id*. at 57.) The VE testified that if above hypothetical individual could have no contact with the general public, as well as no contact with coworkers or supervisors, that would preclude all work. (*Id*.) The VE testified that if the hypothetical individual needed redirection or constant instructions up to one-third of the day, that would be work preclusive. (*Id*.)

The ALJ clarified that her hypothetical individual "can interact with coworkers and supervisors for a short and for a specific purpose, such as asking questions, clarifying instructions, et cetera." (*Id*. at 58.) The VE testified that that clarification does not change her opinion. (*Id*.)

### III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100, 416.1201.

10

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that they are not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must show that they suffer from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c), 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent the claimant from doing their past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent the claimant from doing their past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, Carlisle was insured on the alleged disability onset date, January 1, 2010, and remains insured through December 31, 2017, the date last insured ("DLI"). (Tr. 112.) Therefore, in order to be entitled to DIB, Carlisle must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

11

1.  The claimant met the insured status requirements of the Social Security Act through December 31, 2017.

2.  The claimant has not engaged in substantial gainful activity since January 1, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: degenerative disc disease of the cervical and lumbar spines; bipolar disorder; panic disorder and social anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except never climb ladders, ropes and scaffolds; frequently climb ramps and stairs; avoid all exposure to hazardous equipment and work at unprotected height; and can perform simple, routine task (unskilled work) with infrequent change and no fast pace or high production quotas, i.e. no hourly quotas, no direct work with the general public but incidental contact is acceptable; can interact with coworkers and supervisors for a short duration and for a specific purpose such as asking questions, clarifying instructions, gathering information, helping or using hand gestures to point or direct where items may be place; can work in a setting without exposure to crowds (10 or less people), can perform low stress work meaning no arbitration, negotiation, responsibility for the safety of others or supervisory responsibility.

6.  The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on July 12, 1971 and was a younger individual age 18-49, on the amended disability onset date. The claimant subsequently changed age category to closely approaching advanced age on July 11, 2021 (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, at any time through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

12

(Tr. 25-34.)

## V.  STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the

13

Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### A.    Step Two.

In his first assignment of error, Carlisle argues the ALJ found the following severe impairments: degenerative disc disease of the cervical and lumbar spines; bipolar disorder; panic disorder and social anxiety disorder but erred in failing to include "major neurocognitive disorder" as one of his severe impairments. (Doc. No. 7 at 12.) Carlisle asserts the failure to include this impairment is erroneous and not supported by substantial evidence. (*Id*.) Carlisle states Dr. Konieczny, Ph.D., diagnosed him with "major neurocognitive disorder" likely due to his history of alcohol and drug use, and the ALJ's failure to explain excluding this impairment means her decision is not supported by substantial evidence. (*Id*. at 12-13.)

14

In response, the Commissioner states whether the ALJ found any individual impairment is legally irrelevant because the ALJ did find Plaintiff had severe mental impairments and imposed a "very restrictive mental RFC." (Doc. No. 9 at 8, citing Tr. 25, 28.) The Commissioner points out that the ALJ considered the only evidence of major neurocognitive disorder – Dr. Konieczy's report, and explained why that report was not persuasive. (*Id*. at 8.) The Commissioner asserts that because the ALJ continued past step two, considered all severe and non-severe impairments, and assessed an RFC supported by substantial evidence, Plaintiff's argument should be rejected. (*Id*. at 9.)

"Before an ALJ can find that an individual is disabled, the ALJ must find that the individual has a 'severe' impairment." *Kirkland v. Comm'r of Soc. Sec.*, 528 F. App'x 425, 427 (6th Cir. 2013); s*ee* 20 C.F.R. § 404.1520(a)(4)(ii). "If the individual has at least one severe impairment, the ALJ will then assess how much work the individual can still do." *Id*., *see* 20 C.F.R. § 404.1520(a)(4)(iv). When making that assessment, "the ALJ must consider limitations and restrictions imposed by all of [the] individual's impairments, even those that are not severe." *Kirkland,* 528 F. App'x at 427, citing *Fisk v. Astrue,* 253 Fed.Appx. 580, 583 (6th Cir.2007) (internal quotation marks omitted); *see also* 20 C.F.R. § 404.1523; *Pompa v Comm'r of Soc. Sec.,* 73 F. App'x 801, 803 (6th Cir. 2003) ("Under the regulations, once the ALJ determines that a claimant has at least one severe impairment, the ALJ must consider all impairments, severe and non-severe, in the remaining steps."); *see Draine v. Comm'r of Soc. Sec*., No. 1:22-cv-1370, 2024 WL 1014030, at *16 (N.D. Ohio March 8, 2024 (*citing Pompa*). If the ALJ considers all the individual's impairments, the "failure to find additional severe impairments . . . does not constitute reversible error." *Kirkland,* 528 F. App'x at 427, citing *Fisk,* 253 Fed.Appx. at 583 (brackets and internal quotation marks omitted); *see also Garris v. Comm'r of Soc. Sec*., No. 3:11-cv-2538, 2013 WL 3990754, at *7 (N.D. Ohio Aug. 2, 2013) ("Any failure to identify other impairments, or combinations of impairments, as severe in step two is harmless error and 'legally irrelevant.'").

15

Here, at Step Two, the ALJ found Carlisle had severe impairments. (Tr. 25.) The ALJ properly proceeded through the sequential process and considered both severe and non-severe impairments to determine how much work Carlisle could still do. (*Id*. at 25-28.) The ALJ wrote, in part, at Step Two:

> The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.06. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in one extreme limitation or two marked limitations in a broad area of functioning. An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis. A marked limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis.
>
> In understanding, remembering or applying information, the claimant has a moderate limitation. The claimant underwent a consultative psychological examination performed by J. Joseph Konieczny, Ph.D. on July 5, 2023 and he administered the Wechsler Adult Intelligence Scale-IV (WAIS-IV) and he indicated that the claimant had a Full Scale IQ of 58, which is in the extremely low range of intellectual functioning. Based on these findings, he diagnosed the claimant with a neurocognitive disorder. However, the evidence indicates that the claimant has obtained his GED. Furthermore, treatment records from Crossroads Health note that the claimant has normal fund of knowledge and intact memory (Exhibits C17F, p. 8; C19F; C21F).
>
> In interacting with others, the claimant has a moderate limitation. Treatment records note that the claimant has anger and irritability. He also has indicated that he dislikes being around people. Nevertheless, the evidence indicates that he lives with his father. There is also evidence that he has a girlfriend. Moreover, mental status exams note that the claimant is friendly and cooperative with good eye contact. Dr. Konieczny also completed a medical source statement of ability to do work-related activities (mental) at the time of the consultative exam and he concluded that the claimant has moderate limitation in his ability to interact appropriately with the public, supervisors and coworkers (Exhibits C3F, pp. 9, 42, 49, 55, 80, 226; C17F, p. 8; C20F, p. 16; C21F, p. 9; and testimony).
>
> With regard to concentrating, persisting or maintaining pace, the claimant has a moderate limitation. The claimant has stated that he has trouble concentrating and cannot focus. At the consultative exam performed by Dr. Konieczny, he noted that the claimant would have difficulty maintaining focus and persistence on mild to moderately complex tasks. However, mental status exams in the record note intact attention and concentration and linear and logical thought process (Exhibits C3F, pp. 9, 80; C17F, p. 8; C21F, p. 6; and testimony).

As for adapting or managing oneself, the claimant has experienced a moderate limitation. The evidence indicates that the claimant has good hygiene. He also has fair to good insight and judgment on mental status exams. However, there is evidence of low frustration tolerance. He also has fleeting suicidal thoughts although the claimant does not have a plan or intent. In addition, the evidence notes that the claimant has a history of cannabis use. He also has a significant legal history and is currently on probation (Exhibits C3F, pp. 11, 39, 42, 49; C5F, p. 5; C17F, p. 8; and testimony)

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

(Tr. 27-28.) The ALJ found Carlisle had severe impairments, including mental impairments, recognized other non-severe impairments, and considered both when forming the RFC. (*Id*. at 25-28.) Even if the non-severe impairments could be considered severe, they were considered in the ALJ's opinion. While Carlisle would classify his impairments differently, it is not the Court's job to do so on appeal. *Ealy*, 594 F.3d at 512 ("[The] Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards."). It is the ALJ's job to weigh the evidence and resolve conflicts, and she did so here. While Carlisle would weigh the evidence differently, it is not for the Court to do so on appeal. There is no error.

**B.      Subjective Complaints.**

In his second assignment of error, Carlisle argues the ALJ's conclusion that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms are not entirely consistent with the record evidence is in error. (Doc. No. 7 at 13.) Carlisle states this finding is not supported by substantial evidence. (*Id*. at 13-14.) Carlisle asserts, despite the ALJ finding otherwise, his mental health examinations have not been "generally normal", obtaining his GED and driver's license does not discount his cognitive impairment, and he does not care for his chronically ill father. (*Id*. at 16-17.)

The Commissioner argues the ALJ adequately explained why Plaintiff's subjective complaints are inconsistent with the record. (Doc. No. 9 at 9.) The Commissioner states the ALJ's finding is supported by

17

virtually all mental status examinations, the ALJ properly considered that Plaintiff treated with medication and counseling, and the ALJ considered Plaintiff helped care for his elderly father, despite his recent testimony that he does not care for his father, he lives with his father and previously testified that he does help care for his father. (*Id*. at 10-11.) While Plaintiff points out some abnormal examination, the Commissioner asserts that merely pointing to other evidence is asking the Court to reweigh, which is impermissible. (*Id*. at 11.)

A two-step process is used to evaluate an individual's symptoms. (20 CFR § 404.1529(c)(3), 416.929(c)(3); *Soc. Sec. Ruling 16-3p Titles II & XVI: Evaluation of Symptoms in Disability Claims*, SSR 16-3P (S.S.A. Oct. 25, 2017), 2017 WL 5180304.) At step one, the ALJ determines whether the individual has a medically determinable impairment that could reasonably be expected to produce the individual's alleged symptoms. (*Id*.; SSR 16-3p, 2017 WL 5180304 at *3.) At step two, the ALJ evaluates the intensity, persistence, and limiting effects of the claimant's symptoms. (*Id*. at *4.) "[O]bjective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms . . . [an ALJ] must consider whether an individual's statements about the intensity, persistence, and limiting effects of his or her symptoms are consistent with the medical signs and laboratory findings of record." (*Id.* at *5.)

An ALJ may consider the following factors when evaluating the intensity, persistence, and limiting effects of a claimant's symptoms:

1. Daily activities;
2. The location, duration, frequency, and intensity of pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;
6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

18

> 7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

(*Id*. at \*7-8.) An ALJ is not required to analyze all seven factors. *Pettigrew v. Berryhill*, No. 1:17-CV-01118, 2018 WL 3104229, at \*16 (N.D. Ohio June 4, 2018), *report and recommendation adopted,* No. 1:17CV1118, 2018 WL 3093696 (N.D. Ohio June 22, 2018), citing *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005).

In evaluating complaints of pain or other symptoms, an ALJ may properly consider the credibility of the claimant. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997), citing *Kirk v. Secretary of Health and Human Servs.,* 667 F.2d 524, 538 (6th Cir.1981), *cert. denied,* 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983). "[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Id*., citing *Villarreal v. Secretary of Health and Human Servs.,* 818 F.2d 461, 463 (6th Cir.1987). "Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Id*. citing *Beavers v. Secretary of Health, Educ. and Welfare,* 577 F.2d 383, 386–87 (6th Cir.1978).

"An ALJ's determination of subjective evidence receives great deference on review." *Jones v. Comm'r of Soc. Sec. Admin.*, No. 1:21-CV-01257-DAC, 2022 WL 3155823, at \*16 (N.D. Ohio Aug. 8, 2022), citing *Ulman v. Comm'r of Soc. Sec.,* 693 F.3d 709, 714 (6th Cir. 2012). "Absent compelling reason, this Court may not disturb the ALJ's analysis of the claimant's subjective complaints or the conclusions drawn from them." *Id*., citing *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-CV-0098, 2019 WL 1282105, at \*2 (N.D. Ohio Mar. 20, 2019). "As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess[.]" *Ulman*, 693 F.3d at 713-14.

Here, the ALJ analyzed Carlisle's symptoms, writing in part:

19

The claimant testified at his hearing on May 1, 2023 that he cannot work due to problems with mood. He also stated that he gets panic attacks three times a week. He stated that during a panic attack, he cannot breathe. He indicated that they last about 15-20 minutes. He stated that when he is out in public, he feels angry and paranoid. He stated that he also has memory problems and cannot stay focused. He indicated that he no longer drives due to road rage. He stated that he is currently on probation due to domestic violence charges and child support. He indicated that his case manager is helping him with these cases. He also stated that his case manager reads his mail for him. He testified that he lives with his father but that his sister comes over and prepares the meals. At the supplemental hearing on October 16, 2023, the claimant testified that he continues to be disabled due to his panic attacks with shortness of breath. He stated that he has issues being around people.

The evidence indicates that the claimant has a history of complaints of back pain (Exhibit C1F, pp. 6, 7). A cervical spine x-ray dated January 25, 2018 showed degenerative changes with multilevel disc space narrowing (Exhibit 1F, p. 14). More recently, the claimant underwent a lumber spine x-ray on July 11, 2022 which demonstrated minimal arthritis with normal vertebral alignment (Exhibit C13F). On physical exam. the claimant has demonstrated tenderness and decreased range of motion of the lumbar spine at times but normal muscle strength, normal sensation, normal reflexes and normal gait (Exhibits C1F, pp. 6, 7; C12F, pp. 2-6, 8).

With regard to the claimant's mental impairments, Crossroads Health records note that the claimant has diagnoses of bipolar disorder, current episode depressed, mild and panic disorder with agoraphobia. There is also evidence of social anxiety (Exhibits C3F, pp. 5, 31, 39, 61; C20F, pp. 2, 16). These records note that the claimant has symptoms that include anger, irritability, and frustration, low energy and motivation, low self-esteem, anhedonia, trouble with concentration, and appetite and sleep disturbance. The claimant has indicated that he does not like to be around other people and isolates. He has some fleeting suicidal thoughts but no plan or intent (Exhibits C3F, pp. 9, 42, 61, 79, 97, 237; C5F, p. 5; C20F, pp. 1, 16). Nevertheless, mental status exams have generally been normal. These records note that the claimant is alert and oriented in all spheres, is cooperative, has intact attention and concentration, logical and linear thought process, good fund of knowledge, intact memory, fair to good insight and judgment with no hallucination, delusions, paranoia or abnormal perceptions. Further, the treatment records indicate that the claimant is stable and making progress with his treatment. Treatment has included counseling and medication including Prozac, Abilify and Trazodone. Finally, it should be noted that despite the claimant's allegations that he is unable to function, he is able to care for his father who has Parkinson's and dementia. Treatment records note that the claimant has no interest in

working and wants SSDI (Exhibits C3F, pp. 21, 71, 72, 80-81, 90, 132-133, 142, 194; C5F, pp. 5, 16; C11F, pp. 17, 25; C15F, pp. 4-5, 14, 23, 45, 49; C17F, pp. 1, 8)

As noted above, the claimant underwent a consultative psychological examination performed by Dr. Konieczny on July 5, 2023 and he diagnosed the claimant with major depressive disorder, recurrent, moderate with anxious distress, panic disorder, major neurocognitive disorder, possibly due to history of problematic use of alcohol and other drugs, without behavioral impairment, mild and antisocial personality disorder. Dr. Konieczny administered the WAIS-IV and the claimant atttained [*sic*] a Full Scale IQ of 58, which is in the extremely low range of intellectual functioning with verbal comprehension of 66, perceptual reasoning of 71, working memory of 66, and processing speed of 50. However, these scores are inconsistent with the evidence that the claimant obtained his GED and has a valid driver's license. He also showed no deficits in his ability to perform logical abstract reasoning at the exam and Dr. Konieczny concluded that the claimant was an adequate historian. Further, as noted above, the claimant has good fund of knowledge and intact memory. Moreover, as noted above, the claimant is able to care for his father who has dementia and Parkinson's (Exhibits C19F, C21F).

Therefore, after careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

(Tr. 29-30.) The ALJ properly followed the two-step process for evaluating Carlisle's symptoms. At step-one, the ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms . . ." (*Id*. at 30.) The ALJ ultimately found the "claimant's statement's concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (*Id*.) The ALJ considered the objective medical evidence, including diagnoses, examination results, medication treatment, counseling treatment, Carlisle's testimony, and activities of daily living including caring for his elderly father. (*Id*.) In doing so, the ALJ discussed several of the factors set forth in SSR 16-3p for finding Carlisle's impairments not as debilitating as he alleged. (*Id*.)

21

An ALJ must follow the two-step process for evaluating a claimant's symptoms and as part of that evaluation, an ALJ must consider whether the symptoms are consistent with the objective medical evidence and she did so here. SSR 16-3p, 2017 WL 5180304 at *5. Substantial evidence supports the ALJ's decision. *See Rogers,* 486 F.3d at 241. Given the high level of deference owed to an ALJ's findings with respect to the evaluation of a claimant's alleged symptoms and resulting limitations, under the circumstances presented herein, the court does not find the ALJ's symptom analysis was insufficient. There is no error.

**C.**      **Opinion Evidence.**

Carlisle argues the ALJ's evaluation of the opinion evidence is not supported by substantial evidence. (Doc. No. 7 at 18.) Carlisle asserts the ALJ's finding concerning the persuasiveness of the state agency consultants' opinions is not supported by substantial evidence because the ALJ's RFC finding in this case is consistent with the state agency consultants' opinion and is an adoption of the prior ALJ's finding as well – which was adopted pursuant to *Drummond v. Comm'r Soc. Soc.*, 126 F.3d 837 (6th Cir. 1997). (Id. at 20.) Carlisle argues the Sixth Circuit's opinion in *Early v. Comm'r Soc. Soc.*, 893 F.3d 929 (6th Cir. 2018) and AR-24-1(6) guides an ALJ to consider subsequent claims as new claims and to consider the likelihood of changes concerning a plaintiff's severe impairments and RFC. (*Id*. at 20-21.) Carlisle contends the state agency consultants' opinions only consider "a small portion of the record evidence." (*Id*. at 21.)

Carlisle claims the ALJ's analysis of Dr. Konieczny's opinion does not conform to the regulations and principles of supportability and consistency. (*Id*. at 21-22.) Carlisle states the ALJ's reasoning is flawed when she stated his ability to obtain his GED and driver's license was inconsistent with Dr. Konieczny's opinion. (*Id*. at 21.) Carlisle asserts it is duplicitous for the ALJ to find the opinion unpersuasive and then also rely on the opinion at step three. (*Id*. at 21-22.) Carlisle argues the ALJ requested a consultative examination during the first hearing and Dr. Konieczny performed that examination, which fully supported his opinion. (*Id*. at 22.)

Carlisle asserts the ALJ finding Dr. Schenkelberg and Mr. Kravetz's opinions not persuasive is unreasonable because treatment records consistently demonstrate abnormal mental status examinations and the need for help with daily activities and are consistent with Dr. Konieczny's findings. (*Id*. at 22.)

In response, the Commissioner contends the ALJ properly evaluated the state agency opinions. (Doc. No. 9 at 13-14.) The Commissioner explains that *Early* clarified that res judicata does not apply when a claimant files a subsequent application for a different period, and that the ALJ can review prior findings but is not bound by them. (*Id*. at 13.) The Commissioner points out the ALJ found she was not bound by the prior ALJ decision, she summarized the relevant evidence from the relevant time period, and found the prior administrative findings were supported and consistent with the current record. (*Id*. at 14.) The Commissioner contends the ALJ complied with *Early* and gave this claim a fresh look. (*Id*.) In response to Plaintiff's argument that the state agency opinions did not consider much evidence, the Commissioner argues the state agency opinions considered evidence of Plaintiff's mental health providers and Mr. Kravetz's May 2011 opinion. (*Id*.) While they did not rely on Dr. Konieczny's report or Dr. Schenkelberg's opinion and notes, the Commissioner notes the ALJ found these opinions unpersuasive. (*Id*.)

The Commissioner argues the ALJ properly found Dr. Konieczny's opinion not supported by his own examination findings because it was based on a neurocognitive disorder, yet the exam showed no deficits in his ability to perform logical abstract reasoning. (*Id*. at 15.) The Commissioner states the ALJ considered the consistency factor when she found the opinion inconsistent with Dr. Schenkelberg's mental status findings showing good fund of knowledge and intact memory. (*Id*.)

The Commissioner indicates the ALJ considered both supportability and consistency of Dr. Schenkelberg and Mr. Kravetz's opinions, finding them inconsistent with each other and unsupported by their own mental status exams and notes. (*Id*.)

Since Carlisle's claim was filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 404.1520c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." 20 C.F.R. § 404.1520c(a). Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability;[4] (2) consistency;[5] (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements. 20 C.F.R. § 404.1520c(a), (c)(1)-(5). However, supportability and consistency are the most important factors. 20 C.F.R. § 404.1520c(b)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions. The new articulation requirements are as follows:

> (1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not

---

[4] The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1).

[5] The Revised Regulations explain the "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).

24

administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

(2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

(3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. § 404.1520c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.,* No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. § 416.920c(a), (b)(1)).  A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

The ALJ analyzed the state agency opinions of Drs. Sounder and Haskins as follows:

25

> The State Agency mental capacity assessments completed by Janet Souder, Psy.D. dated October 6, 2021 and Kristen Haskins, Psy.D. dated July 26, 2022 are persuasive because they have program knowledge and found that the claimant has moderate limitations in understanding, remembering or applying information, interacting with others, in concentration, persistence and maintaining pace and in adapting or managing oneself, which is supported by and consistent with the evidence. Moreover, the consultants adopted Administrative Law Judge Loesel's residual functional capacity under Drummond and found that the claimant can perform simple routine tasks (unskilled work) with infrequent change and no fast pace or high production quotas; no direct work with general public; superficial interaction with coworkers (meaning of a short duration for a specific purpose) can work in a setting w/out exposure to crowds (10 or less people) can perform low stress work meaning no arbitration, negotiation, responsibility for safety of others or supervisory responsibility, which is persuasive because it is generally consistent with the overall evidence (Exhibits C5A, C6A, C9A, C10A).

(Tr. 31.) While the ALJ stated that the opinions were persuasive because they are "supported by and are consistent with the evidence", the ALJ offered no discussion of either the supportability or consistency factors.  The ALJ's failure to discuss the supportability and consistency factors is reversible error. *See* 20 C.F.R. § 416.920c(b)(2) (the ALJ "must explain the supportability and consistency factors when discussing a medical opinion."); *see, e.g., Russell v. Comm'r of Soc. Sec. Admin.,* No. 1:25-CV-640, 2025 WL 3187093, at *5 (N.D. Ohio Nov. 14, 2025), *report and recommendation adopted sub nom. Russell v. Comm'r of Soc. Sec.,* No. 1:25 CV 640, 2026 WL 27587 (N.D. Ohio Jan. 5, 2026); *Brenda T. v. Comm'r of Soc. Sec. Admin.*, No. 2:23-cv-2980, 2024 WL 3506947, at *10 (S.D. Ohio July 22, 2024) (finding that the ALJ committed reversible error when he failed to discuss the supportability of a medical opinion), *report and recommendation adopted*, 2024 WL 3677636 (S.D. Ohio Aug. 6, 2024); *Kopec v. Comm'r of Soc. Sec.*, No. 1:23-cv-680, 2023 WL 6958636, at *7 (N.D. Ohio Oct. 20, 2023) ("Simply put, the ALJ didn't comply with the regulations" when she failed to discuss the supportability factor, "which is grounds for reversal."); *John F. v. Comm'r of Soc. Sec. Admin.*, No. 3:22-cv-260, 2023 WL 4759127, at *6 (S.D. Ohio July 26, 2023) ("[T]his Court agrees that the ALJ failed to follow the regulatory requirement to evaluate the consultants'

26

opinions for supportability. The failure to comply with a legal requirement constitutes reversible error.”);

*Reed v. Comm'r of Soc. Sec.*, No. 3:20-cv-2611, 2021 WL 5908381, at *6 (N.D. Ohio Dec. 14, 2021) (the

ALJ's failure to discuss the supportability factor was reversible error). Because the ALJ failed to comply

with the regulations requiring her to consider both the supportability and consistency factors, remand is

required.

In her analysis of the opinion of Dr. Konieczny, the ALJ wrote:

> The opinion of J. Joseph Konieczny, Ph.D. who performed the consultative psychological examination on July 5, 2023 is not persuasive because he concluded that the claimant has a neurocognitive impairment based on his IQ test scores on the WAIS-IV which he administered but these scores are not consistent with the overall evidence in the record including that the claimant was able to obtain his GED and has a valid driver's license. Moreover, Dr. Konieczny found that the claimant would have fairly significant limitations in understanding, remembering and carrying out instructions, would have difficulty maintaining focus and persistence on mild to moderately complex multi-step tasks, would have significantly diminished tolerance for frustration and diminished coping skills which would impact his ability to respond to even simple supervision and interpersonal situations in the work setting and would have significantly diminished tolerance for frustration and diminished coping skills which would impact his ability to respond to even simple pressure situations in the work setting but the overall evidence, including his relatively normal mental status exams, establish that the claimant is not that limited but instead, has moderate limitations in these areas. Dr. Konieczny also completed a medical source statement of ability to do work-related activities (mental) at the time of the consultative exam and he concluded that the claimant has moderate limitation in his ability to interact appropriately with the public, supervisors and coworkers, which is consistent with the evidence but he also indicated that eh [*sic*] claimant has marked limitations in understand and remember simple and complex instructions, carry out simple and complex instructions, make judgments on simple work-related and complex work-related decisions, and respond appropriately to usual work situations and changes in a routine work setting and the overall evidence establishes that he is not that limited in these areas (Exhibits C19F; C21F).

(Tr. at 31-32.) Here, the ALJ discusses the consistency factor, discussing that his opinion is inconsistent

with the overall evidence of record, Plaintiff's ability to obtain his GED and driver's license, and relatively

27

normal mental status exams. The ALJ also discusses supportability, mentioning the IQ tests Dr. Konieczny

administered as well as the medical source statement he completed.

The ALJ analyzed the opinion of Dr. Schenkelberg as follows:

> A mental residual functional capacity assessment completed by the claimant's psychiatrist, Richard Schenkelberg, M.D. dated December 1, 2022 is not persuasive because he indicated that the claimant is unable to meet competitive standards or has no useful ability to function to work including unskilled work, semi-skilled to skilled work and particular types of jobs and he would be absent more than four days a month but such findings are inconsistent with Dr. Schenkelberg's own treatment records which note that the claimant is stable and has relatively normal mental status exams including that the claimant is alert and oriented in all spheres, is cooperative, has intact attention and concentration, logical and linear thought process, and good insight and judgment with no hallucination, delusions, paranoia or abnormal perceptions (Exhibit C16F-see Exhibits C3F, pp. 80-81, 90, 132-133, 142; C5F, p. 16; C11F, p. 17; C15F, pp. 4-5, 14, 23, 45, 49).

(*Id*. at 32.) Here, the ALJ considers the supportability factor, explaining that Dr. Schenkelberg' opinion is

inconsistent with his own treatment records noting Plaintiff is stable and has relatively normal mental status

exams.  The ALJ, however, failed to consider the consistency factor. This failure to comply with the

regulations, as discussed above, requires remand. *See Russell*, 2025 WL 3187093, at *5.

The ALJ evaluated Mr. Kravetz's opinion as follows:

> Similarly, the evidence includes a questionnaire completed by the claimant's case manager, Jason Kravetz, M.Ed. dated May 11, 2021 where he found that the claimant is unable to meet the competitive standards or has no useful ability to function in most mental abilities and aptitudes to do work is not persuasive because treatment records do not support such extreme limitations. Moreover, Mr. Kravetz also indicated that the claimant would be absent more than four days a month, which is also not supported by treatment records which indicate stability and relatively normal mental status exams (Exhibit C4F). In addition, there is a statement from Mr. Kravetz dated April 20, 2023 where he indicated that the claimant would not be able to function in a work setting due to his lack of ability to focus on or persist at tasks for any length of time and he does not understand basic social cues. He indicated that the claimant would not appropriately handle social settings and situations. This opinion is also not persuasive because

28

treatment records from Crossroads Health do not support such extreme limitations (Exhibit C18F).

(Tr. 32.) Here, the ALJ considered both the consistency and supportability factors. The ALJ discussed how the opinion is not persuasive because the treatment records indicate that Plaintiff is stable and has relatively normal mental status exams, which do not support the extreme limitations offered by Mr. Kravetz. The ALJ also considered the supportability factor, discussing additional statements of Mr. Kravetz.

For the foregoing reasons, the undersigned recommends this case be remanded to provide the opportunity for the ALJ to include proper analysis of the opinion evidence.

## VII. CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED AND REMANDED for further proceedings consistent with this opinion.

Date: May 14, 2026

*s/ Jonathan Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).**